*In re* MERRIMAN'S APPEAL.

1. WILLS—MENTAL COMPETENCY OF TESTATOR—DELUSION—WHAT CONSTITUTES.

A delusion is a belief in a fact for which there is no foundation.

2. SAME—EVIDENCE.

A mother died testate. No intention was at first entertained by the heirs to contest the will. Later, a contest was decided upon; and, later still, a son, who had been named as one of the executors, and who was a beneficiary under the will, employed an attorney to see that the will was probated. The father persisted in continuing the contest, which caused some bitterness between him and the son. The son died testate, leaving only a small portion of his estate to his father. The father, who, under the statute, would have been the sole heir of his son, contested the will, on the ground, among others, that the deceased cherished an insane delusion regarding him, arising from his continued contest of the mother's will. It was in evidence that the son felt a pride in the trust reposed in him by his mother in naming him as one of the executors of her will. *Held*, that it could not be said that the belief of the son that his father was trying to wrong him by contesting his mother's will had no foundation, and was a delusion.

3. SAME.

Statements made by a testator after the execution of the will, tending to show that he then entertained an insane delusion against a relative, are inadmissible to prove the existence of a delusion at the time the will was made, where the transactions to which they related were likewise subsequent to the will. *Haines* v. *Hayden*, 95 Mich. 332, distinguished.

4. SAME—UNDUE INFLUENCE—PRESUMPTIONS.

The failure of a testator to give all of his property to his near relatives, with some of whom he was not on good terms, raises no presumption of undue influence.

5. SAME—INSTRUCTIONS.

A request for an instruction that, if the testamentary dispositions of the decedent's property are unnatural or un-

just, that, of itself, is an evidence of undue influence, is properly refused.

6. SAME—MENTAL CAPACITY—NON-EXPERT WITNESSES.

The weight of the opinion of a non-expert witness as to the mental capacity of a testator depends upon the opportunity he has had to form an opinion.

7. SAME—UNDUE INFLUENCE—EVIDENCE.

Evidence that one who formerly lived in 'the testator's family was without means, and was therefore a more natural object of his bounty than legatees named in the will, is inadmissible to show lack of testamentary capacity or undue influence.

8. SAME—APPEARANCE OF ASSOCIATE OF DECEASED.

Testimony that a person charged with having exerted undue influence over the testator "always looked rather shy, and generally confused, as though he wanted to do something he was ashamed of," is inadmissible, not being confined to any particular occasion where his appearance was a part of the *res gestæ*.

9. SAME—EVIDENCE AS TO TESTAMENTARY CAPACITY.

Testimony that the testator was a young man of average intelligence is competent to show testamentary capacity.

10. NEW TRIAL—MISCONDUCT OF JURORS.

A verdict in a civil suit will not be set aside because two of the jurors drank beer during the recess of the court, and did acts tending to show that they were not men of good moral character, where such misconduct was not incited by or known to the prevailing party or his counsel, and did not directly influence the action of the jurors.

11. SAME—AFFIDAVITS OF JURORS.

A verdict cannot be impeached by the affidavits of jurors as to conduct indicating bias on the part of a juror, or the exercise of undue influence by one juror upon another, whether such conduct occurred in the jury room, or elsewhere during a recess of the court.

Error to Jackson; Peck, J.    Submitted January 10, 1896.    Decided February 26, 1896.

Dwight Merriman appealed from an order probating the will of Howard L. Merriman, deceased.    The will was again sustained in the circuit, and, a motion for new

trial having been denied, contestant removed the cause to this court by writ of error. Judgment affirmed.

*Pringle, Hewett & Henigan* ( *Wilson & Cobb*, of counsel ), for appellant.

*Blair, Edwards & Blair* ( *Thomas E. Barkworth* and *Benton Hanchett*, of counsel), for proponents and appellees.

MONTGOMERY, J. Appellant has brought here for review the proceedings had in the circuit court on appeal from the probate of the will of Howard L. Merriman, deceased. On a trial before a jury the will was adjudged a valid will. The objections to the probate of the will stated in the appeal from the probate court are that the deceased was possessed of an insane delusion in regard to the appellant, the father of the deceased, which delusion deprived the deceased of testamentary capacity; and that the alleged will was obtained by undue influence exercised upon the deceased. On the trial in the circuit, the circuit judge submitted to the jury the question of whether the deceased possessed testamentary capacity, and also the question of undue influence, but held that there was no testimony in the case fairly tending to show the existence of an insane delusion. The charge of the court upon the subject was as follows:

"I instruct you, in this regard, that if, independent of this question of mental delusion, you find the testator to have been of sound mind, the evidence is insufficient to prove such an insane delusion as would, considered independently, and standing alone, vitiate the will in question. It is, however, proper for you to consider the evidence bearing upon the question of the claimed insane delusion, in connection with all the other evidence bearing upon these questions, in determining whether the testator was in fact of sound mind when the will was made, and whether the will was the result of undue influence practiced upon him."

Counsel for contestant contend that the testimony

tended to show "that, after his mother's death, Howard Merriman felt wronged and aggrieved by her will, and agreed with his father that it should be contested; that he changed his mind, and wanted to support it, and that a feeling grew up on his part against his father, because he (the father) continued in his purpose to contest the will; that this feeling became intense and morbid;" also, that some months after the execution of the will "he fell into a passion, and swore and cried, and insisted that his father was trying to cheat him out of that money,—trying to rob him,—and that Walter Bennett had looked it up, and he knew how it was down there; he knew it was a regular scheme; and that he would put his father behind the bars, if necessary."

Mrs. Merriman, the mother of Howard and wife of Dwight, died June 10, 1892, leaving a will containing bequests to charitable institutions, and named Howard as one of the executors. It appears that at first there was no intent to contest the will, and Dwight Merriman offered to go on Howard's bond when he should qualify as executor. Subsequently it was agreed that the will should be contested, and, as the testimony of contestant tends to show, Howard agreed with his father and sisters that the will should not be sustained; but he, later on, determined that the will should be sustained, and employed an attorney to do so. That this litigation, in which Howard and his father took opposite sides, caused some bitterness between them, is manifest, but is no more manifest from Howard's course than from language used towards him by his father, which bitterness could alone excuse, and which was calculated to leave a sting which would cause, in the mind of Howard, towards his father, a sense of wrong which it would be a wide stretch to call a delusion. A delusion is a belief in a fact for which there is no foundation. It cannot be said that the belief of Howard that his father was trying to wrong him by contesting his mother's will had no foundation. It is said that Howard

would have received more from his mother's estate if her will had been set aside; but it is in evidence that he took pride in the trust reposed in him by his mother in naming him as executor, and, if he became convinced that the will of his mother was properly made, it is certainly not evidence of an insane delusion that he felt that his father, in attempting to defeat the will, was guilty of a wrong, and a wrong against Howard himself, if it can be considered that a dutiful son can have an interest in carrying out the last wishes of a deceased parent. So, as regards the statement which Howard made after the making of the will, implying that his father was trying to cheat him, it can be said of this that Dwight Merriman delayed in turning over to Howard his money, and while such a judgment of his father was harsh, and perhaps unwarranted, it cannot be said it had no foundation in fact. Furthermore, this delusion, if it existed, could not have influenced the making of the will, for it was not shown to have existed until months after the will was executed. So far as it had any tendency to show general mental incapacity, it was submitted to the jury.

We are convinced, by a careful examination of the record, that the circuit judge was right in holding that there was no evidence tending to show an insane delusion. The testimony of the statement of Howard that his father was trying to rob him is not, within the ruling of *Haines* v. *Hayden*, 95 Mich. 332, admissible. In this case the statement was not only made after the making of the will, but related to transactions which had taken place after the will was made; and if, by any stretch, it can be said that a misjudging of the transaction amounts to an insane delusion, it certainly does not tend to show a delusion existing months before. In *Haines* v. *Hayden* the alleged delusion was as to a supposed fact, which, if it existed, antedated the making of the will; and the testimony was admissible, not for the reason that any delusion which found lodging in the mind after the will was

executed would defeat the will, but as tending to show that the particular delusion did exist in the mind of the testator at the time that the will was made.

The charge of the court defining the degree of mental capacity requisite to enable one to make a valid will was full and clear, and followed the previous holdings of this court.

Criticism is made of the charge upon the subject of undue influence. The court charged as follows:

"Undue influence is such influence as suppresses the volition of the testator, and constrains him to give expression to the will of another, instead. Undue influence need not be proven by direct evidence, but may be inferred from circumstances; and, in determining this question, you should take into account the confidential relations existing between the testator and Walter A. Bennett, who, with others, is charged with having exercised such influence; the opportunities of said Bennett and others to exercise an influence over the testator; the fact that this will was made without the knowledge of the natural heirs of the deceased; changes shown by the evidence, if any, between the testator's declared intention and the provisions of the will; any unnatural provisions the will may contain, if there are any; and all the circumstances surrounding the testator at the time this will was executed."

Contestant proposed charges as follows:

"It is to be presumed that the testator, being of sound mind and free volition, will, in general, bestow his property on his next of kin, and will not disinherit his heirs."

"If the testamentary dispositions of deceased's property are unnatural or unjust, this, of itself, is an evidence of undue influence."

The first of these requests was clearly inapplicable to the facts in this case, for the reason that it ignored the fact, shown by the undisputed testimony, that the relations between the deceased and his next of kin were strained; and it is clearly going too far to say that the failure to give all his property to his near relatives, under

such circumstances, raises a presumption of undue influence. The latter request is faulty in that it involves the proposition that an unjust disposition of one's property is presumptively the result of undue influence, and because the question of injustice is to be determined by the judgment of the jury. Such a rule is inconsistent with the right of an owner to do what he will with his own. In *Wallace* v. *Harris*, 32 Mich. 380, 397, it was said:

"The line between due and undue influence, when drawn, must be with full recognition of the liberty due every true owner to obey the voice of justice, the dictates of friendship, of gratitude, and of benevolence, as well as the claims of kindred, and, when not hindered by personal incapacity or particular regulations, to dispose of his own property according to his own free choice."

Numerous errors are assigned upon the admission and rejection of testimony. Error is assigned upon the statement of the circuit judge, in his charge, as follows: "The opinions of others, sworn to upon the stand, are not controlling upon the jury. They are advisory and persuasive, merely." This clause, by itself, does not convey a correct idea of what the circuit judge said upon the subject. The whole clause is as follows:

"You may consider, also, in reaching a conclusion upon the subject, the testimony given by these witnesses who have expressed their opinions upon the subject of his mental competency. The opinions of others, sworn to upon the stand, are not controlling upon the jury. They are advisory and persuasive, merely. And, other things being equal, the judgment of a witness depends, so far as its value is concerned, upon the advantages which he has had as a basis for expressing his judgment. The judgment of a man who knew no more about Howard Merriman than you do would be no better than your own, and no aid to you; so it is not allowed at all. The rule is, however, and the court has proceeded upon it in this case, that any persons' who had some knowledge of him, so as to enable them to form some judgment, might swear to their opinion of his capacity or incapacity, and have their testimony considered by the jury. In considering the opinions of these witnesses, you should remember what

the evidence has shown as to their equipment, so to speak, to express opinions, how much they knew of him, what their acquaintance with him was, and what it covered, and so be able to give such value to their testimony as it really deserves."

This, taken as a whole, could not have misled the jury. In effect, the rule stated is that the weight of an opinion depends upon the opportunity the witness has had to form such opinion, and this is the correct rule.

A Mrs. Beach had formerly lived in the family of the Merrimans, and had been named as a legatee in the will of Mrs. Merriman. She was asked as to her financial condition, and that of her husband; the avowed purpose being to show that, because of her lack of means, she would have been a more natural object of Howard's bounty than those named in his will. This was excluded. It is a startling proposition that the will of a testator may be defeated by showing that, among his *acquaintances*, there were those more in need of funds than those named as legatees. The ruling was right.

Mr. Bennett is charged with having exerted undue influence. A witness for contestant testified: " As to Mr. Bennett's manner, he always looked rather shy, and generally confused, as though he didn't know,—wanted to do something that he was ashamed of, or something." This testimony, as given, was not confined to any particular occasion where the appearance of Mr. Bennett was a part of the *res gestæ*, but was general, and was properly stricken out.

The testimony offered to show, by those who were intimately acquainted with the deceased, that he was a young man of average intelligence, was competent, and responsive to the testimony put into the case by contestant.

We discover no error committed on the trial. The court guarded carefully all the rights of the contestant, both in the reception of evidence and in the instructions to the jury.

A motion for a new trial was made and denied. Error

is assigned upon the rulings made. The grounds stated relate, in part, to misconduct of jurors during the trial, and to acts showing a bias of certain jurors, and a disposition to prejudge the case. These facts were shown by affidavits of other jurors of the panel. The admissibility of their affidavits will be considered later on. The other grounds are that two of the jurors drank beer during the recesses of the court, and did acts tending to show that they were not men of good moral character. The circuit judge found that it did not appear that either of these jurors drank during the time that court was in session, and that it did not appear that their misconduct was incited by, or known to, proponents or their counsel, and, in effect, that their misconduct did not unfit the jurors for the performance of their duty, except as it showed them to be wanting in that sense of duty to themselves and the county which is to be expected of those called to perform the important office of determining rights between litigants. The jurors were part of the regular panel, and, under the circumstances, we are of the opinion of the circuit judge,—that, at least in a civil case, inasmuch as the alleged misconduct did not directly influence the action of the jurors, a new trial should not be granted for this reason. The acts charged against them no more affected their conduct as jurors than as if they had taken place before they were called to serve, and it would be unsafe to set aside a verdict on the ground of such misconduct occurring before the jury is called, when discovered after the verdict.

The circuit judge held that the affidavits of the jurors were not admissible to impeach their verdict, and this ruling involves the most important question covered by the motion for a new trial, and a question by no means free from difficulty. It is the universal rule that the affidavits of jurors are not admissible to impeach their verdict by showing misconduct in the jury room; but as to the other facts occurring during the trial, at a recess of the court, the authorities are not agreed. The great

weight of authority, however, as well as the reason for the rule, supports the contention that, at least as to the question of whether any influence is exerted by one of the jurors unduly upon his fellows, or whether his conduct indicates bias, public policy forbids the proof of such claim by the affidavits of fellow jurors. The reasons for the exclusion of such affidavits are stated to be because it would make it possible for a juror, by his own oath, to impeach his solemn act by affidavits, and would open the door for the defeated party to tamper with the jury. We are not able to see why these reasons do not apply with equal force to facts known only to the jurors, which occur during the trial, whether they occur in or out of the jury room. The cases upon this point are numerous, and the text writers in general agree upon the rule which excludes such affidavits. Hirsh, Jur. § 623; Proff. Jur. § 408. In Thomp. & M. Jur. § 440, note, the case of *Deacon* v. *Shreve*, 22 N. J. Law, 176, is cited as holding that, while the affidavit of a juror cannot be received to show his own misconduct, it may be shown by the oath of a fellow juror who is not inculpated therein. The authors say, "We have not found this qualification of the rule in any other case, and do not think it is sound." The broad rule of exclusion is maintained by the following, among other, authorities: *Williams* v. *Montgomery*, 60 N. Y. 648; *Bartlett* v. *Patton*, 33 W. Va. 71 (5 L. R. A. 523); *Com.* v. *White*, 147 Mass. 76; *Sanitary District of Chicago* v. *Cullerton*, 147 Ill. 385; *Johnson* v. *Allen*, 100 N. C. 131; *Taylor* v. *Garnett*, 110 Ind. 287. The affidavit of a juror may be received to show what took place in open court, and generally to sustain his verdict. And in Tennessee the affidavits of the jurors are received generally to impeach the verdict. In Iowa, Kansas, and Nebraska, affidavits of facts which are said not to inhere in the verdict are held admissible, at least to the extent of admitting affidavits to show that outside influence—that is, other influence than that of members of the panel—was exercised; and such was the case of

*Mattox* v. *U. S.*, 146 U. S. 140, which case adopts the rule in *Woodward* v. *Leavitt*, 107 Mass. 453, that a juror may testify to extraneous influence. In so far as the doctrine of Iowa, Kansas, and Nebraska goes beyond this rule, it is shown to conflict with the great weight of authority. Thomp. & M. Jur. §§ 452, 453. The Massachusetts court subsequently defined what was meant by "extraneous influence," and it is clear that by this was not meant improper communications between jurors themselves, whether in the court room or out of it. *Com.* v. *White,* 147 Mass. 76. We think the affidavits were properly excluded.

We discover no error. Judgment affirmed.

The other Justices concurred.